**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 12-3575
_____

UNITED STATES OF AMERICA

v.

ANTONIO FIGUEROA
a/k/a BABY FAT FACE

Antonio Figueroa,

Appellant

On Appeal from the United States District Court
for the District of New Jersey
(D. C. No. 1-10-cr-00685-001)
District Judge:  Honorable Robert B. Kugler

Argued on July 17, 2013

Before:  RENDELL, SMITH and ROTH, Circuit Judges

(Opinion filed: September 3, 2013)

Ralph A. Jacobs, Esquire (**Argued**)
Jacobs Singer Kivitz & Herman LLC
34 Tanner Street
Haddonfield, NJ 08033

        Counsel for Appellant

Glenn J. Moramarco, Esquire **(Argued)**
Office of United States Attorney
Camden Federal Building & Courthouse
401 Market Street, Fourth Floor
Camden, NJ 08101

Mark E. Coyne, Esquire
Office of United States Attorney
970 Broad Street, Suite 700
Newark, NJ 07102-2535

        Counsel for Appellee

---

O P I N I O N

---

**ROTH**, Circuit Judge:

Antonio Figueroa appeals the District Court's September 11, 2012, judgments of conviction and sentence. Figueroa was convicted of civil rights violations under 18 U.S.C. §§ 241 and 242 and sentenced to ten years imprisonment. On appeal, he challenges his conviction on four grounds: (1) the District Court erred by admitting the out-of-court statement of co-defendant Robert Bayard, (2) the District Court erred by excluding, as cumulative, police reports that Figueroa offered into evidence, (3) the District Court erred by allowing improper expert opinion testimony from a prosecution fact witness on issues of constitutional law, and (4) the District Court erred by refusing to give the jury Figueroa's requested instruction concerning specific intent. Figueroa challenges his sentence on two grounds: (1) the District Court erred by applying the drug distribution sentencing guideline to Figueroa's civil rights violations, and (2) his sentence was substantively unreasonable. For the following reasons, we will affirm the District Court's judgments of conviction and sentence.

## I.  Background

Figueroa joined the police force in Camden, New Jersey, in 2003. In July 2008, he was transferred to a new Special Operations Unit created to target guns, drugs and violence in Camden's most crime ridden neighborhoods. Figueroa was assigned to the "fourth platoon" with his regular partner, Robert Bayard, as well as Sergeant Dan Morris, and officers Jason Stetser and Kevin Parry. On September 6, 2011, Figueroa and Bayard were charged in a six count superseding indictment with a series of civil rights violations.

3

In addition to five substantive civil rights violations, they were charged with conspiring with Stetser, Parry, and Morris to deprive others of their civil rights. A three week jury trial began on November 15, 2011. Stetser, Parry, and Morris all testified at trial as cooperating witnesses with plea agreements. Other law enforcement officers and citizens who were victims of or witnesses to the activities alleged in the indictment also testified. Over the course of trial, the government presented evidence regarding twelve incidents in which Figueroa allegedly deprived individuals of their civil rights. There are six specific incidents of misconduct described below that are relevant to Figueroa's arguments on appeal.

**August 9, 2008:** Figueroa and Stetser were conducting surveillance on an open-air drug market and observed "A.K" sell drugs to "T.C." When they arrested the participants, Stetser found a bundle of crack cocaine and Figueroa found a bag filled with money. Morris, Figueroa, and Stetser took some of this money for themselves. After the arrest, T.C. cooperated with the officers and gave them information about other drug-dealing activity, but A.K. did not. Stetser and Figueroa attributed to A.K. drugs and a gun that were not actually found on him. Specifically, they attributed to him (1) drugs that Stetser had stashed in a nearby tree, (2) a handgun located in a house that T.C. told them about, and (3) the "re-up stash" of drugs they found in a nearby garage. Figueroa wrote the falsified police report about this incident.

**September 14, 2008:** Figueroa, Stetser, Parry, and Morris conducted illegal searches in the Winslow Court apartment complex based on information from an informant.

4

The officers broke into Apartment C, where they found between $1,500 and $2,000, and then searched, without consent or a warrant, Apartment G, where they found $10,000. When they found no drugs, they confronted their informant who pointed them to a mailbox in the complex, where they found a large stash of cocaine. Figueroa wrote the police report, in which he falsely claimed that they had seen someone take drugs out of the mailbox, throw a bag in Apartment G and flee through Apartment C. The report stated that they had recovered only $1,531 in cash.

**September 17, 2008:** Figueroa and Bayard arrested "D.B.#1" on the street who then told them that he had a gun at home. The officers then drove to his house, coerced his mother into signing a consent to search form, and found a firearm in a bedroom closet. Figueroa's police report falsely claimed that he found the firearm in plain view after chasing D.B.#1 into the house and arresting him there. Figueroa also underreported the amount of money that was seized during the events.

**September 17, 2008:** Figueroa, Bayard, Stetser, and Parry apprehended "A.F" and "T.R." Angry that A.F. and T.R. had fought them, Figueroa, Bayard, Stetser, and Parry decided to plant drugs on A.F. and T.R. Bayard wrote the false police report about this incident.

**April 3, 2009:** Figueroa, Stetser, and Parry, based on information from an informant, found "L.M." in a car and searched the car, expecting to find drugs. They found no drugs in L.M.'s car, but Parry found crack cocaine in the gas cap of a vehicle that was parked on the opposite side of the street and several cars away. Figueroa falsely stated in the

police report that he had seen L.M. walking down the street carrying the drugs in his right hand. Parry gave the drugs he found in the gas cap to Figueroa, and Figueroa turned the drugs in as evidence.

**August 21, 2009:** Stetser conducted a warrantless search of a trailer based on a tip that "J.M." was selling drugs out of it. He found 32 bags of crack cocaine in a compartment on the door of the trailer. Figueroa falsely claimed in his police report that he had observed J.M. engage in a hand-to-hand drug transaction and that J.M. had 32 bags of a rock-like substance in his right pocket.

On December 9, 2011, the jury returned a guilty verdict against Figueroa on Count 1 of conspiracy to deprive others of civil rights and on Counts 2 and 3 of substantive civil rights violations relating to incidents occurring between September 14 and September 17, 2008. The jury acquitted Figueroa of the remaining counts and acquitted Bayard on all counts. Figueroa filed motions for a judgment of acquittal, or in the alternative, a new trial under Federal Rules of Criminal Procedure 29 and 33 on December 23, 2011. The District Court denied both motions. He was sentenced to ten years imprisonment on September 7, 2012. This appeal followed.

III. **Discussion**[1]

Figueroa challenges both his conviction and sentence on appeal. Because the most significant issue in this appeal is the application of the drug distribution sentencing guideline

---

[1] The District Court had jurisdiction over this case pursuant to 18 U.S.C. § 3231, and we have jurisdiction over the appeal pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

to Figueroa's civil rights violations, we will deal with that issue first.

### A. Application of the Drug Distribution Guideline

Figueroa argues that the District Court erred in applying the drug distribution sentencing guideline, U.S.S.G. § 2D1.1, to his civil rights violations in this case because he was not convicted of offenses involving the distribution of drugs.[2]

Figueroa was convicted of violations of 18 U.S.C. §§ 241 and 242. The applicable sentencing guideline for these violations is U.S.S.G. § 2H1.1. Under U.S.S.G. § 2H1.1(a), the base offense level should be the greatest of the enumerated options, including "the offense level from the offense guideline applicable to any underlying offense." U.S.S.G. § 2H1.1(a). Application Note 1 explains that "offense guideline applicable to any underlying offense" refers to "the offense guideline applicable to any conduct established by the conviction that constitutes an offense under federal, state, or local law . . .." U.S.S.G. § 2H1.1, Application Note 1. Where the conduct established by the conviction constitutes more than one underlying offense, the court should look to the underlying offense that carries the highest offense level. U.S.S.G. § 2H1.1, Application Note 1.

---

[2] We exercise plenary review over the District Court's construction of the Sentencing Guidelines but review the District Court's factual determinations for clear error. *United States v. Cordo*, 324 F.3d 223, 229 (3d Cir. 2003).

Additionally, under U.S.S.G. § 2H1.1(b), if the defendant was a public official or the offense was committed under color of law, the base offense level should be increased by 6 levels. U.S.S.G. § 2H1.1(b).

Here, the presentence report, in accordance with U.S.S.G. § 2H1.1, presented an analysis of the conspiracy's underlying offenses and offense levels. The presentence report concluded that applying U.S.S.G. § 2D1.1, the drug distribution sentencing guideline, would produce the highest offense level in Figueroa's case: an offense level of 26.[3] Once increased by 6 levels as provided in U.S.S.G. § 2H1.1(b), Figueroa's proposed offense level was 32. At sentencing, the District Court adopted this base offense level over Figueroa's objection.

In using U.S.S.G. § 2D1.1 to determine Figueroa's base offense level, the District Court relied heavily on a recent case, *United States v. Cortes-Caban*, 691 F.3d 1, 16 (1st Cir. 2012), in which the First Circuit Court of Appeals held that police officers who conspired to plant drugs on individuals to fabricate criminal offenses were properly convicted of conspiracy to possess controlled substances with an intent to distribute in violation of 21 U.S.C. §§ 841(a) and 846.[4] The court reasoned that the plain language of 21 U.S.C.

---

[3] The other underlying offenses and offense levels proposed in the presentence report were: (1) illegal searches (offense level 18); (2) false reports (offense level 8); larceny (offense level 6); and perjury (offense level 17).

[4] A violation of § 841(a) falls under U.S.S.G. § 2D1.1, and thus the *Cortes-Caban* analysis of the term "distribute" in § 841(a) is relevant to Figueroa's sentencing under U.S.S.G. §

8

§ 841(a), which deems it "unlawful for any person knowingly or intentionally— (1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance . . .", encompassed the police officers' conduct. *Cortes-Caban*, 691 F.3d at 16 (quoting 21 U.S.C. § 841(a)). The court focused on the meaning of "distribute" in the statute, noting that the Controlled Substances Act defines "to distribute" as "to deliver (other than by administering or dispensing) a controlled substance or a listed chemical" and defines "deliver" as "the actual, constructive, or attempted transfer of a controlled substance or a listed chemical, whether or not there exists an agency relationship." *Id.* at 17 (quoting 21 U.S.C. §§ 802(11), 802(8)).[5] Based on this definition of "distribute," that court found that "[t]he defendants' acts of transferring drugs amongst each other and to the victims constitutes an intent to distribute the drugs under § 841(a)(1), which results in a transfer of possession of a controlled substance, in other words a 'distribution,'" and upheld the police officers' convictions under 21 U.S.C. §§ 841(a) and 846.[6] *Id.* at 18, 26.

---

2D1.1.

[5] The court interpreted "transfer" by reference to its commonly accepted meaning because it is not defined in the Controlled Substances Act. *Cortes-Caban*, 691 F.3d at 17 ("To transfer means 'to carry or take from one person or place to another . . . ; to move or send to a different location . . . ; to cause to pass from one person or thing to another.'" (quoting *Webster's Third New International Dictionary* 2426-27 (1993))).

[6] We note that the police officers in *Cortes-Caban*, in addition to being convicted of violations of 21 U.S.C. §§ 841(a) and 846, were also convicted of civil rights violations under 18

In this case, the District Court, upon identifying the distribution of narcotics as an underlying offense based on relevant paragraphs of the superseding indictment, which "all allege trafficking in drugs, planting of drugs on individuals," reviewed the evidence from trial regarding four specific instances of drug distribution on August 9th, September 17th, April 3rd and August 21st. Applying the reasoning of *Cortes-Caban*, the District Court stated: "The [*Cortes-Caban*] defendants' act of transferring the drugs amongst each other and to the victims constitutes . . . a distribution. And that's what happened in some of these instances here."[7] On that basis, the District Court found "beyond a reasonable doubt that [Figueroa] was involved in distribution of narcotics." Because U.S.S.G. § 2D1.1 is the offense guideline applicable to the distribution of narcotics, the District Court applied U.S.S.G. § 2D1.1 here and adopted the proposed offense level of 32.[8]

---

U.S.C. § 241. *Cortes-Caban*, 691 F.3d at 5-6.

[7] We note that the District Court adopted the reasoning of *Cortes-Caban* in a different context: whereas the court in *Cortes-Caban* adopted this interpretation of "distribute" in reviewing police officers' convictions of conspiracy to possess controlled substances with the intent to distribute, the District Court in this case adopted this interpretation in sentencing Figueroa for convictions of civil rights violations involving the distribution of drugs. However, this distinction does not affect our analysis here.

[8] The District Court stated: "For this guideline to apply there only needs to be 28 grams. There's more than 28 grams in those four instances. Therefore I think the Probation Department is correct as to the offense level, and I'm going to

10

We conclude that the District Court correctly found that Figueroa engaged in distribution of narcotics and therefore its application of U.S.S.G. § 2D1.1 was proper in this case.  In so holding, we adopt the court's interpretation in *Cortes-Caban* of the meaning of "distribute" under 21 U.S.C. § 841(a).  This interpretation comports with the plain language of the statute and its legislative history.  Under the plain language of the statute, a "distribution" encompasses the transfer of a controlled substance from one person or place to another and thus the planting of controlled substances on individuals to facilitate false arrests.  *Cortes-Caban*, 691 F.3d at 17-18.  Congress made a deliberate choice to use broad language in § 841(a), and courts have interpreted "distribute" broadly in the context of § 841(a).  *Id.*  Moreover, the statute carves out specific exceptions for legitimate activities, such as the distribution of drugs by certain registered persons and by law enforcement officers *lawfully engaged* in the enforcement of controlled substances laws, which supports the application of § 841(a) to conduct outside those exceptions.  *Id.* at 18-19 (citing 21 U.S.C. §§ 822(b), 885(d)).

In challenging his sentence, Figueroa attempts to rely on Judge Torruella's dissent in *Cortes-Caban*.[9]  Figueroa's

---

find the total offense level is 32 in this case for the reasons expressed."  Figueroa does not challenge the drug quantity calculation on appeal.

[9] Judge Torruella dissented in *Cortes-Caban* on the basis that the majority's "analysis incorrectly center[ed] on whether the officers' actions could properly constitute 'distribution,' an issue . . . not before [the court] . . ." and "blurr[ed] the distinction between the *actus reus* of one crime and the *mens rea* of another (distribution versus possession with intent to

11

reliance on this dissent is misplaced because Judge Torruella focused on the specific intent required to convict for possession of controlled substances with the intent to distribute. *Cortes-Caban*, 691 F.3d at 30-31 (Torruella, J., dissenting). Here, however, the District Court did not find that Figueroa possessed narcotics with the intent to distribute but rather found that he was involved in the *distribution* of narcotics, a general intent crime. The specific intent discussion in Judge Torruella's dissent is irrelevant here.[10]

Figueroa also argues that, even under the *Cortes-*

---

distribute) . . . ." *Cortes-Caban*, 691 F.3d at 30-31 (Torruella, J., dissenting). Because the police officers in *Cortes-Caban* were convicted not of distribution but of possession with the intent to distribute, Judge Torruella asserted that the relevant inquiry was not whether the police officers' acts constituted distribution but whether the police officers had the specific intent to distribute controlled substances. *Id.* He concluded that the government had not proven the requisite specific intent and thus the police officers' convictions under 21 U.S.C. §§ 841(a) and 846 should not be affirmed. *Id.* at 47.

[10] Figueroa also attempts to distinguish *Cortes-Caban* on the facts, but this attempt is unavailing. First, he asserts that the police acts in *Cortes-Caban* were entirely unlawful. Because his own acts were equally unlawful, this is not a convincing grounds on which to differentiate the instant case. Second, he argues that the police officers in *Cortes-Caban* intended to introduce drugs into society's illicit channels. This is inaccurate: Judge Torruella noted in his dissent that "the drugs never left the control or authority of the police officers." *Cortes-Caban*, 691 F.3d at 46 n.57 (Torruella, J., dissenting).

*Caban* interpretation of "distribution" in § 841, there was no "distribution" here. Figueroa alleges that the only transfer of drugs was from Figueroa to the police evidence room and that "[t]he act of turning drugs into the police evidence room simply is not a criminal drug offense." This is an inaccurate characterization of the facts. At sentencing, Figueroa's counsel suggested that at least one of the incidents involved a co-conspirator planting drugs on an individual or on the scene. He stated: "[t]hat except for Stetser's testimony about the stash in a tree, I believe all of the other incidents are incidents where Antonio Figueroa or someone with him at the scene took contraband and turned it in. And so, . . . I believe five out of six [of the incidents listed in the presentence report] don't fit into that category." Moreover, the District Court stated in response, "[e]ven if one does [involve the planting of drugs], then [Figueroa] is to be judged under . . . the drug distribution guidelines . . .."

Because we conclude that Figueroa engaged in the distribution of drugs in committing civil rights violations, the District Court properly applied U.S.S.G. § 2D1.1 in sentencing him.[11] However, we urge that this application of the drug distribution sentencing guideline be strictly limited to civil rights violations in cases like this one where drug distribution constituted an active part of the civil rights violation, and where, as here, the District Court specifically finds that the drug distribution was clearly established by the

---

[11] We note that this application of § 841(a) to the planting of drugs by police officers is not a common application. As the court noted in *Cortes-Caban*, there have not been any other decisions on prosecutions under § 841 for the planting of drugs. 691 F.3d at 22.

offense of conviction.[12]

### B. Challenges to the Conviction

Turning to Figueroa's challenge to his conviction, he raises four arguments: (1) the District Court erred by admitting the out-of-court statement of co-defendant Robert Bayard, (2) the District Court erred by excluding, as cumulative, police reports that Figueroa offered into evidence, (3) the District Court erred by allowing improper expert opinion testimony from a prosecution fact witness on issues of constitutional law, and (4) the District Court erred by refusing to give the jury Figueroa's requested instruction concerning specific intent. For the reasons that follow, these arguments are unavailing, and we will affirm his conviction.

---

[12] Figueroa also suggests in a footnote in his opening brief that "[a]pplying the Narcotics Distribution guidelines would . . . run afoul of [his] Sixth Amendment rights by virtue of the fact that the jury in this case . . . was not asked to consider a drug dealing case, thus its verdict cannot be construed as a finding that narcotics distribution occurred." The District Court's application of the drug distribution sentencing guidelines did not violate Figueroa's Sixth Amendment rights. Under *Apprendi v. New Jersey*, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt." 530 U.S. 466, 490 (2000). Here, because Figueroa's sentence does not exceed the statutory maximum, this finding did not need to be made by a jury and thus Figueroa's Sixth Amendment rights were not violated.

14

First, Figueroa argues that the District Court erred by admitting an out-of-court statement by co-defendant Bayard.[13] Figueroa challenges the admission of the following testimony by co-conspirator Parry regarding Bayard's out-of-court statement about Figueroa:

Q. Did you have a conversation with Mr. Bayard during one of these three nights about the search at 1017 Spruce Street?

A. Yes, I did.

Q. What was said during that conversation?

A. Bayard was complaining about the report that Figueroa had written. He said the report was F'd up. And he tried talking to Figs about the right way to write the report and he didn't want to listen.

The District Court admitted this statement as a statement in furtherance of the conspiracy under Federal Rule of Evidence 801(d)(2)(E) which provides that a statement "made by the party's coconspirator during and in furtherance of the conspiracy" is not hearsay. Fed. R. Evid. 801(d)(2)(E). For a statement to be admitted under this rule, "the proponent

---

[13] "We review a District Court's decision to admit or exclude evidence for abuse of discretion, although our review is plenary as to the district court's interpretation of the Federal Rules of Evidence." *United States v. Duka*, 671 F.3d 329, 348 (3d Cir. 2011) (internal quotation marks and citations omitted).

15

must establish by a preponderance of the evidence that (1) the conspiracy existed; (2) both the defendant and the declarant were members of the conspiracy; and (3) the statement was made in the course of the conspiracy and in furtherance of the conspiracy." *United States v. Bobb*, 471 F.3d 491, 498 (3d Cir. 2006). The furtherance requirement is usually given a broad interpretation. *Duka*, 671 F.3d at 348

Figueroa argues that Bayard's statement was not made in furtherance of the conspiracy and therefore the third prong of this test was not met. In response to Figueroa's post-trial motion on this issue, the District Court held that the statement was a comment on the inability to instruct a co-conspirator on how to write police reports so that no one got into trouble. We find ample evidence in the record to support the District Court's conclusion that the writing of false reports was part of the conspiracy and that Bayard's statement, expressing concern about Figueroa's inept report-writing, was in furtherance of the conspiracy.[14]

---

[14] Figueroa also challenges the admission of this statement under the Confrontation Clause and *Bruton v. United States*, 391 U.S. 123 (1968). The protections of the Confrontation Clause and *Bruton* apply only to testimonial statements. *See United States v. Berrios*, 676 F.3d 118, 126-29 (3d Cir. 2012) (noting that "where nontestimonial hearsay is concerned, the Confrontation Clause has no role to play in determining the admissibility of a declarant's statement" and that *Bruton* is also limited to testimonial statements). Bayard's statement to Parry was not a testimonial statement. *See United States v. Crawford,* 541 U.S. 36, 51-52 (2004) (identifying as the core class of testimonial statements "ex parte in-court testimony," "extrajudicial statements," and "statements . . . made under

Second, Figueroa argues that the District Court erred by excluding, under Federal Rule of Evidence 403, police reports that Figueroa offered into evidence.[15] Under Rule 403, a court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. Here, the District Court excluded the proffered police reports because the defendants failed to establish that the reports had any probative value beyond the fact that they were false, which the witness had already acknowledged in his testimony. On that basis, the District Court concluded that giving these reports to the jury would "just wast[e] time." We conclude that there was no error in the District Court's exclusion of these reports.

Third, Figueroa argues that the District Court erred by allowing improper expert opinion testimony from a prosecution fact witness on issues of constitutional law.[16] Specifically, he alleges that prosecution fact witness Michael Lynch of the Camden Police Department impermissibly testified that a signed consent to search form was a

circumstances, which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial"). Therefore, Figueroa's Confrontation Clause and *Bruton* argument is inapposite.

[15] "We review a district court's decision to admit or exclude evidence for abuse of discretion, and such discretion is construed especially broadly in the context of Rule 403." *United States v. Kemp*, 500 F.3d 257, 295 (3d Cir. 2007) (internal quotation marks and citation omitted).

[16] For standard of review see footnote 13.

constitutional requirement rather than just local police department procedure.

On direct examination, Lynch stated that a consent to search form must be signed before a search is conducted and then added, "that's not a Camden Police Department procedure, that the [sic] established by law and constitutional procedure." Figueroa did not contemporaneously object to this statement but instead questioned Lynch further on this point on cross-examination. Figueroa subsequently objected to "the law or legal concepts . . . coming from the witness stand, from fact witnesses" and asserted that Lynch's testimony "has confused the jurors into thinking they have gotten some guidance on what the constitutional law is." In response to Figueroa's objection, the District Court found that the jury had not been left with an impression that Lynch was testifying about what the Constitution requires, stating, "[i]t was very clear to me and very clear to the jury [that the Camden Police Department procedures] is what the witness was talking about." At the conclusion of trial, the District Court properly instructed the jury on constitutional requirements concerning consent to search. From our review of the record, we agree with the District Court's assessment that Lynch was testifying about Camden Police Department procedures, not constitutional law.

Fourth, Figueroa argues that the District Court erred by refusing to give the jury his requested instruction concerning specific intent under 18 U.S.C. § 242.[17] The District Court

---

[17]    "Review of the legal standard enunciated in a jury instruction is plenary, . . . but review of the wording of the instruction, *i.e.*, the expression, is for abuse of discretion."

18

instructed the jury that to convict under § 242, the government must prove beyond a reasonable doubt that Figueroa (1) "acted under the color of law;" (2) "deprived a person or persons alleged in the particular count of the Indictment of their Constitutional liberty and property rights, without due process of law, or their Constitutional right to be free from unreasonable search and seizures;" and (3) "acted knowingly, intentionally, and willfully." The District Court further instructed the jury:

> The specific intent required by law . . . is an intent to deprive a person of a federal right which has been made definite either by express terms of the Constitution or laws of the United States or by decisions interpreting them, or to act with reckless disregard of a constitutional requirement which has been made specific and definite. . ..

> You may find the particular defendant under consideration acted with the requisite specific intent, even if you find the defendant had no real familiarity with the specific constitutional rights involved, provided you find that the defendant under consideration willfully and consciously did the act which deprived the person of his or her constitutional rights.

> You may find a particular defendant acted

*United States v. Yeaman*, 194 F.3d 442, 452 (3d Cir. 1999) (citations omitted).

19

willfully if he performed an act in open defiance or reckless disregard of a constitutional [requirement] which has been made specific and definite.

On appeal, Figueroa claims that the District Court erred by rejecting the following proposed instruction on the issue of specific intent:

It is not necessary for the government to prove that the defendant was thinking in specific constitutional terms provided that the government proves that the defendant's aim was not to enforce local law but to deprive a citizen of a right and that right was protected by the Constitution.

We find no error here. The District Court's jury instruction correctly stated the law. *See United States v. Johnstone*, 107 F.3d 200, 208 (3d Cir. 1997) (holding that a defendant "need not be 'thinking in constitutional terms' in order to be convicted of violating § 242" and that "it is enough to trigger § 242 liability if it can be proved . . . that a defendant exhibited reckless disregard for a constitutional or federal right." (quoting *Screws v. United States*, 325 U.S. 91, 106 (1945))). Furthermore, as the District Court noted, the use of the term "not to enforce local law" in Figueroa's proposed instruction is "very confusing." We conclude, therefore, that the District Court's jury instruction correctly stated the law and that the court did not abuse its discretion in rejecting Figueroa's proposed instruction.

### C. Substantive Reasonableness of the Sentence

20

Finally, Figueroa argues that his sentence was substantively unreasonable based on the discrepancy between the length of his sentence and those of his co-conspirators. We review a sentence for substantive reasonableness under an abuse of discretion standard, and the party challenging the sentence bears the burden of showing unreasonableness. *United States v. Tomko*, 562 F.3d 558, 567 (3d Cir. 2009). "A sentence that falls within the guidelines is more likely to be reasonable than one outside the guidelines range." *United States v. Cooper*, 437 F.3d 324, 332 (3d Cir. 2006). Figueroa has not borne his burden of proving the substantive unreasonableness of his within-guidelines sentence. He has done no more than note the disparity between his sentence and the sentences of his co-conspirators. This alone does not demonstrate substantive unreasonableness. *See United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006) ("Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case."). Therefore, Figueroa's sentence was not substantively unreasonable.

## IV.  Conclusion

For the foregoing reasons, we will affirm the District Court's judgments of conviction and sentence.